STATE BOARD OF TAX COMMISSIONERS OF INDIANA *v.* JACKSON.

No. 183. Argued March 5, 1931.—Decided May 18, 1931.

528

*Messrs. Joseph W. Hutchinson* and *George W. Hufsmith,* Deputy Attorneys General of Indiana, with whom *Messrs. James M. Ogden,* Attorney General, *Hugh D. Merrifield,* and *V. Ed. Funk,* Deputy Attorneys General, were on the brief, for appellants.

*Messrs. William H. Thompson* and *Martin A. Schenck,* with whom *Messrs. Samuel Ashby, Clark McKercher,* and *Henry H. Hornbrook* were on the brief, for appellee.

529

530

MR. JUSTICE ROBERTS delivered the opinion of the Court.

This is an appeal from the decree [1] of a specially constituted District Court [2] perpetually enjoining the appellants from enforcing against the appellee the provisions of Act No. 207 of 1929 of the General Assembly of the State of Indiana. The appellee, by bill filed on behalf of himself and all others similarly situated, charged that the

[1] 38 F. (2d) 652.
[2] Pursuant to U. S. C., Tit. 28, § 380.

statute violates the Fourteenth Amendment of the Federal Constitution and two sections of the constitution of Indiana. It averred, and the answer admitted, that, unless enjoined, appellants would institute prosecutions against appellee under certain sections of the act. After hearing, the District Court entered a perpetual injunction, holding the law offensive to the federal and to the state constitution.

The statute provides that it shall be unlawful for any person, firm, association or corporation, foreign or domestic, to establish or operate any store[3] within the State without first obtaining from the appellants a license, which must be renewed annually. It makes the operation of a store without a license a misdemeanor punishable by a fine of not less than twenty-five dollars nor more than one hundred dollars for each day it is so operated.

Section 5 of the act provides:

" Every person, firm, corporation, association or copartnership opening, establishing, operating or maintaining one or more stores or mercantile establishments, within this state, under the same general management, supervision or ownership, shall pay the license fees hereinafter prescribed for the privilege of opening, establishing, operating or maintaining such stores or mercantile establishments. The license fee herein prescribed shall be paid annually, and shall be in addition to the filing fee prescribed in sections 2 and 4 of this act.

" The license fees herein prescribed shall be as follows:

"(1) Upon one store, the annual license fee shall be three dollars for each such store;

---

[3] Section 8 defines a store as follows:

" The term ' store ' as used in this act shall be construed to mean and include any store or stores or any mercantile establishment or establishments which are owned, operated, maintained or controlled by the same person, firm, corporation, copartnership or association, either domestic or foreign, in which goods, wares, or merchandise of any kind, are sold, either at retail or wholesale."

"(2) Upon two stores or more, but not to exceed five stores, the annual license fee shall be ten dollars for each such additional store;

"(3) Upon each store in excess of five, but not to exceed ten, the annual license fee shall be fifteen dollars for each such additional store;

"(4) Upon each store in excess of ten, but not to exceed twenty, the annual license fee shall be twenty dollars for each such additional store;·

"(5) Upon each store in excess of twenty, the annual license fee shall be twenty-five dollars for each such additional store."

It is this section which appellee asserts renders the act unconstitutional as applied to him.

The bill of complaint alleges, and it is admitted, that the appellee is engaged in the business of selling groceries, fresh vegetables and meats at wholesale and retail in Indianapolis, and has been so engaged for more than ten years, has capital invested in his business, in excess of $200,000, and annual sales of over $1,000,000. He operates two hundred and twenty-five stores in the said city, and more than five hundred persons, firms, associations and corporations, foreign and domestic, are engaged in the operation of two or more stores in the State.

The bill charges that the graduation of the tax per store according to the number of stores under a single ownership and management is based on no real difference between a store part of such a group and one individually and separately owned and operated, or between the businesses transacted in them; that the number of stores conducted by one owner bears no relation to the public health, welfare, or safety, none to the size of the enterprise as a whole, to its capital, its earnings or its value; that the classification made by the statute is without basis in fact, is unreasonable and arbitrary, and results

in depriving him of his property without due process, and denying him the equal protection of the laws.

In the court below appellants defended on the grounds that the statute was an exercise of the police power and was also a revenue measure which levied an ordinary occupation tax. They offered no evidence to sustain the first ground mentioned, and do not press it here. They now stand only upon the power of the legislature, in prescribing an occupation tax, to classify businesses, so long as its action is not unreasonable and arbitrary. They say that the act fulfills the constitutional requirement that, in so classifying, the law-making body shall apply the same means and methods to all persons of the same class, so that the law will operate equally and uniformly, and all similarly circumstanced will be treated alike. The District Court held that the statute failed to conform to this standard.

The act adopts a different measure of taxation for stores known as chain stores, from that applied to those owned and operated as individual units. Evidence was offered by the appellee intended to demonstrate that there are no substantial or significant differences between the business and operation of the two kinds of stores, such as would justify the classification, and by the appellants to prove the existence of such differences.

The District Court failed to make findings of fact and law as now required by Equity Rule 70½, but contented itself with a partial summary of the facts and certain general conclusions of law. Had the rule been in force at the time of the trial, we should feel constrained to remand the case with directions to make such findings. We shall, in the circumstances, summarize the proofs.

In addition to the facts averred in the bill, above set forth, the appellee offered uncontradicted evidence on the following points. Of the retail stores of the country ap-

proximately sixty-three per cent. are independent or community stores, sixteen per cent. are department stores, twelve per cent. are chain stores, and four per cent. are mail-order houses. Several department stores in Indianapolis, doing a much larger business than the appellee, pay a tax of only $3 as contrasted with his tax of $5443, although their business is highly competitive with that of chain stores. Persons owning a greater number of stores, and with more money invested, in a business similar to that of appellee, but having only one store in Indiana, pay $3 because they have but one store in the State. Large numbers of stores independently owned and controlled are members of associations or "voluntary chains" under which coöperative buying is conducted for the group, but each of them is required to pay a license fee of only $3. The mere addition of a new unit or store to an existing chain of stores does not increase the sales more than arithmetically. The additional unit has its own expenses, and the volume of sales of the former stores in the chain, to which it constitutes an addition, is not increased by adding it.

The appellants produced evidence to prove that there are many points of difference between chain stores and independently owned units. These consist in quantity buying, which involves the application of the mass process to distribution, comparable to the mass method used in production; buying for cash and obtaining the advantage of a cash discount; skill in buying, so as not to overbuy, and at the same time keep the stores stocked with products suitable in size, style and quality for the neighborhood customers who patronize them; warehousing of goods and distributing from a single warehouse to numerous stores; abundant supply of capital, whereby advantage may be taken of opportunities for establishment of new units; a pricing and sales policy different from that of the indi-

vidual store, involving slightly lower prices; a greater turn-over, and constant analysis of the turn-over to ascertain relative profits on varying items; unified, and therefore cheaper and better advertising for the entire chain in a given locality; standard forms of display for the promotion of sales; superior management and method; concentration of management in the special lines of goods handled by the chain; special accounting methods; standardization of store management, sales policies and goods sold.

The appellants' evidence indicated that all of these advantages are interrelated and interdependent in the chain store business. The witnesses conceded that some of them may be found in large independent grocery or drug stores or the like, but they did not, as appellee claims, state that all of them combined, exist therein, as in chain stores.

The record shows that the chain store has many features and advantages which definitely distinguish it from the individual store dealing in the same commodities. With respect to associations of individual stores for purposes of coöperative buying, exchange of ideas as to advertising, sales methods, etc., it need only be remarked that these are voluntary groups, and that series of independent units cannot, in the nature of things, be as efficiently and successfully integrated as a chain under a single ownership and management.

But the appellee in proof and argument drew a comparison between the chain store and the department store which he insists exhibits the classification of the statute as illusory and arbitrary. He proved that there are two department stores in Indianapolis, each doing a business in excess of $8,000,000 a year, one having 124 and the other 86 separate departments, and that under the law each pays a tax of only $3. He uses these facts to give point to

his assertion that a store is not a unit of value. This argument ignores the fact that in determining how it shall classify occupations for taxation, the legislature is not confined merely to the value of the business taxed, but may have regard to other elements.

While it is true that large department stores reap many of the advantages and employ many of the methods of a chain store group, such as large capital, buying in quantity, and the ability to command the highest type of management, it is, nevertheless, evident that, whereas a department store spreads its efforts over a number of different sorts of shops under one roof, the chain store owner concentrates its energy upon the conduct of but one kind of stores located in many neighborhoods. Obviously, greater specialization in management and methods is possible in the latter type of enterprise than in the former, whose management, however capable, must after all consist of many separate types each devoted to a single store similar to an independent retail store. The mass buying done by a chain store owner for a number of units selling the same goods, is not comparable to the individuated purchasing of a department store for its grocery, its shoe, its drug, and each of its other departments. It is not to be expected that the management problems of stores, essentially separate and differing entirely in the character of their business, under the aegis of a single department store, will be the same as those involved in the intensive selling of a chain store owner operating an equal number of units all devoted to a single line of business.

Notwithstanding the differences disclosed between chain and other stores, the court below found that " all persons engaged in the operation of one or more stores . . . belong to the same class, for occupational tax purposes, as plaintiff, and should pay the same license fee, regardless of the number of stores owned and operated by them," and that any other classification is arbitrary

and unconstitutional. It is this holding which the appellants challenge.

The principles which govern the decision of this cause are well settled. The power of taxation is fundamental to the very existence of the government of the States. The restriction that it shall not be so exercised as to deny to any the equal protection of the laws does not compel the adoption of an iron rule of equal taxation, nor prevent variety or differences in taxation, or discretion in the selection of subjects, or the classification for taxation of properties, businesses, trades, callings, or occupations. *Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232; *Southwestern Oil Co.* v. *Texas,* 217 U. S. 114; *Brown-Forman Co.* v. *Kentucky,* 217 U. S. 563. The fact that a statute discriminates in favor of a certain class does not make it arbitrary, if the discrimination is founded upon a reasonable distinction, *American Sugar Rfg. Co.* v. *Louisiana,* 179 U. S. 89, or if any state of facts reasonably can be conceived to sustain it. *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342; *Quong Wing* v. *Kirkendall,* 223 U. S. 59. As was said in *Brown-Forman Co.* v. *Kentucky, supra,* at p. 573:

"A very wide discretion must be conceded to the legislative power of the State in the classification of trades, callings, businesses or occupations which may be subjected to special forms of regulation or taxation through an excise or license tax. If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law."

It is not the function of this Court in cases like the present to consider the propriety or justness of the tax, to seek for the motives or to criticize the public policy which prompted the adoption of the legislation. Our duty is to sustain the classification adopted by the legislature if there are substantial differences between the occupations

separately classified. Such differences need not be great. The past decisions of the Court make this abundantly clear.

In *American Sugar Rfg. Co.* v. *Louisiana, supra,* a license tax imposed upon persons and corporations carrying on the business of refining sugar and molasses, which excepted planters and farmers grinding and refining their own sugar and molasses, was held not to work an unconstitutional discrimination.

In *Cargill* v. *Minnesota,* 180 U. S. 452, a state statute requiring the proprietors of warehouses situated on the right of way of a railroad to secure a license from a state commission, and containing no such requirement with respect to warehouses not so situated but doing exactly the same business, was held valid.

In *Armour Packing Co.* v. *Lacy,* 200 U. S. 226, a North Carolina statute imposed an occupation tax upon every meat packing house doing business in that State. The Armour Company, which was taxed under this statute, had its packing house at Kansas City and shipped its packed products to various depots in the State, where they were sold and delivered in competition with wholesalers and commission merchants who were not required to pay the tax. The statute was sustained.

In *Quong Wing* v. *Kirkendall, supra,* a statute in Montana imposing a license fee on hand laundries was held not to constitute a denial of the equal protection of the laws because it did not apply to steam laundries, and because it exempted from its operation laundries not employing more than two women.

In *Bradley* v. *Richmond,* 227 U. S. 477, an ordinance imposed a tax on the conduct of various businesses and gave a power of classification to a committee of the council. That committee classified private bankers, placing a tax of one amount on certain of them and of a different amount on others. It appeared that the busi-

ness of those in the one class was that of lending money at high rates upon salaries and household furniture, while that done by the other class was that of lending money upon commercial securities. The classification was held not to offend the constitutional provision for equal protection of the laws.

In *Metropolis Theatre Co.* v. *Chicago,* 228 U. S. 61, an ordinance classified theatres for license fees based on and graded according to the admission charged. It was shown that some of the theatres charging a higher admission had less revenue than those charging a smaller price, and therefore paying lower license fees. This Court held the classification valid.

In *Singer Sewing Machine Co.* v. *Brickell,* 233 U. S. 304, there was drawn in question a statute of Alabama which provided that every person, firm or corporation selling or delivering sewing machines in person or through agents should pay a tax of $50 annually for each county in which they might sell or deliver said articles; and for each wagon and team used in delivering or displaying the same an additional sum in each county of $25 annually. It exempted merchants selling sewing machines at their regularly established places of business. The Singer Company, a foreign corporation, was engaged in many counties in the State in selling and renting sewing machines, in part from regularly established places of business and in part by means of wagons going from place to place in counties where its stores were located. It attacked the statute on the ground that it involved an arbitrary discrimination between merchants selling at their stores and merchants selling by means of wagons. It was shown that the merchants who sold at their stores usually delivered the articles sold by wagon. This Court sustained the tax, saying with respect to the two kinds of business [p. 315]:

" But there is an evident difference, in the mode of doing business, between the local tradesman and the itinerant dealer, and we are unable to say that the distinction made between them for purposes of taxation is arbitrarily made. In such matters the States necessarily enjoy a wide range of discretion, and it would require a clear case to justify the courts in striking down a law that is uniformly applicable to all persons pursuing a given occupation, on the ground that persons engaged in other occupations more or less like it ought to be similarly taxed."

In *Rast* v. *Van Deman & Lewis Co., supra,* a statute placing taxes additional to the usual occupations taxes on persons who offered, with merchandise bargained or sold in the course of trade, coupons, profit-sharing certificates, or the like, was attacked as being arbitrary and unreasonable, in that the only difference between the other merchants and those who used trading stamps was a difference in the method of advertising. This Court said, however [p. 357]:

" The difference between a business where coupons are used, even regarding their use as a means of advertising, and a business where they are not used, is pronounced. Complainants are at pains to display it. The legislation which regards the difference is not arbitrary within the rulings of the cases. It is established that a distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that would sustain it, . . ."

In *Armour & Co.* v. *Virginia,* 246 U. S. 1, the statute under attack laid a tax on merchants doing business in the State based on the amount of their purchases during the license period, including as purchases all goods and merchandise manufactured by the licensee and sold or offered for sale in the State. It excluded from its operation domestic manufacturers, taxed on capital, who offered for sale at the place of manufacture goods and merchan-

dise manufactured by them. It applied alike to citizens and residents of Virginia and noncitizens and nonresidents who manufactured in Virginia. The state supreme court held that it applied to Armour & Co., who manufactured part of their products without the State and sold them within it. This Court said [p. 6]:

" In the first place, we are of opinion that the distinction upon which the classification in the statute rests between a manufacturer selling goods by him made at their place of manufacture and one engaged as a merchant in whole or in part in selling goods of his manufacture at a place of business other than where they were made is so obvious as to require nothing but a mere statement of the two classes. All question concerning the equal protection clause of the Fourteenth Amendment may therefore be put out of view."

In view of the numerous distinctions above pointed out between the business of a chain store and other types of store, we cannot pronounce the classification made by the statute to be arbitrary and unreasonable. That there are differences and advantages in favor of the chain store is shown by the number of such chains established and by their astonishing growth. More and more persons, like the appellee, have found advantages in this method of merchandising and have therefore adopted it. What was said in *Metropolis Theatre Co.* v. *Chicago, supra,* [p. 69] is quite applicable here:

". . . The distinction obtains in every large city of the country. The reason for it must therefore be substantial, and if it be so universal in the practice of the business it would seem not unreasonable if it be adopted as the basis of governmental action."

The court below fell into the error of assuming that the distinction between the appellee's business and that of the other sorts of stores mentioned was solely one of own-

ership. It disregarded the differences shown by the record. They consist not merely in ownership, but in organization, management, and type of business transacted. The statute treats upon a similar basis all owners of chain stores similarly situated. In the light of what we have said this is all that the Constitution requires. *Clark* v. *Titusville,* 184 U. S. 329; *Magoun* v. *Illinois Tr. & Savings Bank,* 170 U. S. 283.

- Article 1, § 23 of the constitution of Indiana [4] which the court below held the statute violates, seems to us not to set any different standard than does the Fourteenth Amendment. No decision of the Indiana courts is cited in support of the court's conclusion, and those referred to by appellants demonstrate that the section permits classification for purposes of taxation and that the same principles are applicable as under the Fourteenth Amendment. *Kersey* v. *Terre Haute,* 161 Ind. 471; 68 N. E. 1027; *Gafill* v. *Bracken,* 195 Ind. 551; 145 N. E. 312; 146 N. E. 109. Article 10, § 1,[5] is declared by the Supreme Court of the State to be applicable only to the assessment made under a general levy, and not to occupation or license taxes. *Thomasson* v. *State,* 15 Ind. 449; *Bright* v. *McCullough,* 27 Ind. 223; *Gafill* v. *Bracken, supra.* We cannot, therefore, hold the statute repugnant to the clauses of the state constitution on which the appellee relies.

---

[4] "The General Assembly shall not grant to any citizen or class of citizens privileges and immunities which upon the same terms shall not equally belong to all citizens."

[5] "The General Assembly shall provide by law for a uniform and equal rate of assessment and taxation; and shall prescribe such regulations as shall secure a just valuation for taxation of all property, both real and personal, excepting such only, for municipal, educational, literary, scientific, religious or charitable purposes as may be especially exempted by law."

The judgment of the District Court must be reversed and the cause remanded with instructions to dismiss the bill.

*Reversed.*

Mr. Justice Sutherland, dissenting.

By the statute here under review, the operation of any " store " within the state without a license is made unlaw-.ful. The license fees to be paid are graduated according to the number of " stores " to be operated " under the same general management, supervision or ownership." Upon one store, the annual license fee is $3; upon two or more up to five, $10 for each additional store; in excess of five but not exceeding ten, $15 for each additional store; in excess of ten but not exceeding twenty, $20 for each additional store; and in excess of twenty, $25 for each additional store.

Upon the face of the statute the sole differentiation on which the graduated and rapidly mounting license fees depend consists in the number of stores operated. But the tax is imposed in respect of a single " store," without regard to kind, value, size, amount invested, amount or character of business done, income derived, or other distinguishing feature. The number of stores is a collateral circumstance used only to determine the amount of the license fee to be exacted in respect of each of them. A retailer pays the same as a wholesaler; the owner of a small corner grocery, operated by him alone, the same as the owner of a large department store employing hundreds of clerks. To determine that a tax of $25, instead of $3, $10, $15, or $20, shall be imposed in respect of any store, it is necessary only to have an affirmative answer to the inquiry: Is this store operated by a person who already owns or operates twenty or more stores? These facts are of controlling importance because they give rise to the

point upon which the question of constitutionality depends.

It is settled that the power of the State to classify for purposes of taxation is of wide range and flexibility; but that, while the difference upon which the classification is based need not be great, mere difference is not enough. Classification, to be legitimate, must rest upon some ground of difference having a reasonable and just relation to the object of the legislation. All persons similarly circumstanced must be treated alike. *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 37, and cases cited. These principles, repeatedly stated by this Court, are fundamental; and it reasonably cannot be doubted that their application to the present act, unless saved by certain extrinsic circumstances to be considered later, necessarily condemns it as unconstitutional. I am unable to find in any of these circumstances, or in all of them together, justification for a classification which results in distributing the burden of taxation with such evident inequality.

The purpose of the act is to raise revenue, and upon that theory the decision of this Court is based. The contention that the act constitutes an exercise of the police power finds no support in the record and was but faintly urged at the bar. Whether the classification could be justified if the statute were other than a revenue measure, is a question, therefore, with which we are not now concerned. The pertinent and only question is whether between a store constituting one of a series under unified management, supervision or ownership, and a store under single and distinct management, supervision or ownership, there are such differences as to justify putting them in separate categories with the object of imposing, for the sole purpose of revenue, a larger tax in respect of one than in respect of the other. If the differences bear no just and reasonable relation to that object, the classification cannot be sustained, although the same differences

might bear such a relation to some other and different object.

In the State of Indiana there are approximately 44,000 retail stores engaged in the same general lines of business, only eight per cent. of which are so-called " chain stores." Among them are single stores each of greater value than all the stores of appellee combined, and each doing a business in excess of all that done by appellee. For example, there are two large department stores in the City of Indianapolis each doing a business of more than $8,000,000 per annum, one operating 124 separate departments and the other, 86 separate departments, but each pays a license fee under the statute of only $3 per annum; while appellee, owning 225 separate stores and doing a total business of approximately $1,000,000 per annum, pays license fees of $5,443 per annum—eighteen hundred times as much! Each of several owners of a large number of stores, (145 in one instance) who happens to have only one store in Indiana, pays a license fee of $3, contrasted with the payment of $25 for each store over twenty owned by appellee. Appellee, upon 205 of his stores, pays the aggregate sum of $5,125; while the proprietors of 205 stores, held and operated separately, pay in the aggregate only $615, although they or some of them may be of equal or greater value, equally well or better located, doing as much or more business, and producing as much or more income. The evidence further shows that a " coöperative volunteer chain " consisting of several hundred stores in Indiana paying an annual license fee of only $3 each, operates under an association called the Independent Grocers' Alliance. The association carries on coöperative buying and advertising for the benefit of the members of the group; and it seems clear that as to most, if not all, of the advantages said to be enjoyed by the chain stores the volunteer coöperative group occupies a position of equality.

These are obvious and flagrant discriminations which put upon the act the clear stamp of unconstitutionality, unless the differences relied upon are germane to, and reasonably sufficient in substance to sustain, the proposed imposition of license fees of such unequal amounts upon different persons following identical occupations.

What, then, are the differences, or so-called advantages, relied upon to justify the classification? They were, in their strongest aspect, stated by an expert witness called by the appellants in support of the act, as follows: The ability of the chain stores to make large quantity purchases; to pay cash and thus obtain the advantage of discounts; skill in buying so as to avoid either overstocking or understocking; warehousing in, and distribution from, a single warehouse for numerous stores; large capital with the advantages flowing therefrom; certain pricing and sales policies resulting in slightly lower prices on the part of the chain stores as compared with single stores; more rapid turn-over of goods; cheaper and better advertising; superior management; standardization in the matter of display; standardization of store management; and similar elements thought to have a beneficial effect upon the disposition of goods.

But the effect of this enumeration of supposed advantages is completely swept away by the testimony of the same witness on cross-examination, which stands upon the record without dispute, that they are not confined to the chain stores, but are enjoyed as well by such of the favored taxpayers as are engaged in large business, whether in a single establishment or in many establishments.

" Every advantage that I have spoken of as relating to the chain group is that which inheres, primarily, in volume and management without respect to whether it is involved in a chain group or in a single store. Good management makes for volume and volume makes for the

possibility of making or acquiring more capital, and more capital makes for the possibility of employing the highest grade of experts, so that there is constant intercommunication or revolving. I would find the same advantage adhering in a large department store over a small one. Every quality that I have enumerated as going to the manner of organization relates itself, primarily, to there being a sufficient capital structure and volume of business to permit it to be carried on and I would add management in that it is an essential part of it.

. . . . .

" Q. So that it does not relate itself to the form of organization—whether they are administering fifty or a hundred stores, or administering one store.

"A. No, no.

. . . . .

" Q. The fact that it is administering multiply-owned stores has nothing to do with it, but it is the fact that it is administering a large business that develops the situation that you have referred to?

"A. That is true. But I might add that the management of a large number of stores may contribute to the more rapid increases in the size.

" Q. Just as the manager of a large unit store, with many departments, may develop the ability to strengthen and enlarge those departments?

"A. Yes.

" Q. And the problem would be identical, wouldn't it in the case of Macy or Gimbel—or, taking it locally, in connection with Ayres, or Block?

"A. Yes, I would say the problem would be the same. There is no difference in the functions that are performed here—the function of retailing."

It thus appears that the advantages attributed to the chain store lie not in the fact that it is one of a *number* of stores under the same management, supervision or owner-

ship, but in the fact that it is one of the parts of a *large business*. In other words, the advantages relied upon arise from the aggregate size of the entire business, and not from the number of parts into which it is divided. For the want of a valid ground upon which to stand, therefore, the classification should fall, because it is made to depend not upon size or value or character, amount of capital invested or income received, but upon the mere circumstance—wholly irrelevant so far as any of the advantages claimed are concerned—that the business of one is carried on under many roofs, and that of the other under one only. Reduced to this single detail of difference, what fairly conceivable reason is there in the policies or objects of *taxation* which gives countenance to the requirement that the former shall make an annual contribution to the revenues of the state eighteen hundred times as much as the latter? A classification comparable in principle would be to make the amount of an income tax depend upon the number of sources from which the income is derived, without regard to the character of the sources or the amount of the income itself.

Since the supposed differences thus are reduced to the one of number only, and, since that turns out to be irrelevant and wholly without substance, it follows that the act is a " clear and hostile discrimination " against a selected body of taxpayers, *Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232, 237—a mere subterfuge by which the members of one group of taxpayers are unequally burdened for the benefit of the members of other groups similarly circumstanced. All of which is to say that the legislature has misapplied its power to classify with the result of reaching an end forbidden by the Fourteenth Amendment.

To this situation the language of Mr. Justice Field in *County of Santa Clara* v. *Southern Pac. R. Co.,* 18 Fed. 385, 399, seems peculiarly applicable.

"Unequal taxation, so far as it can be prevented, is, therefore, with other unequal burdens, prohibited by the amendment. There undoubtedly are, and always will be, more or less inequalities in the operation of all general legislation arising from the different conditions of persons, from their means, business, or position in life, against which no foresight can guard. But this is a very different thing, both in purpose and effect, from a carefully devised scheme to produce such inequality; or a scheme, if not so devised, necessarily producing that result. Absolute equality may not be attainable, but gross and designed departures from it will necessarily bring the legislation authorizing it within the prohibition. The amendment is aimed against the perpetration of injustice, and the exercise of arbitrary power to this end. The position that unequal taxation is not within the scope of its prohibitory clause would give to it a singular meaning. It is a matter of history that unequal and discriminating taxation, leveled against special classes, has been the fruitful means of oppressions, and the cause of more commotions and disturbance in society, of insurrections and revolutions, than any other cause in the world."

It seems plain enough that we have in the present case "a carefully devised scheme to produce such inequality; or a scheme, if not so devised, necessarily producing that result."

In *Quaker City Cab Co.* v. *Pennsylvania*, 277 U. S. 389, this Court held invalid a Pennsylvania statute which imposed a tax upon the gross receipts of a corporation engaged in the general taxicab business, but not upon like receipts of individuals and partnerships engaged in the same business. The differences relied upon as justifying the tax are fairly comparable with those relied upon in the present case. It was said that there were advantages peculiar to the corporate organization not enjoyed by indi-

viduals or partnerships, such as those pointed out in *Flint* v. *Stone Tracy Co.,* 220 U. S. 107, 162: "The continuity of the business, without interruption by death or dissolution, the transfer of property interests by the disposition of shares of stock, the advantages of business controlled and managed by corporate directors, the general absence of individual liability, these and other things inhere in the advantages of business thus conducted, which do not exist when the same business is conducted by private individuals or partnerships."

These advantages, although brought sharply to the attention of the Court, were not considered as constituting differences having a reasonable relation to the object of the taxing act, and the tax was held unconstitutional as denying to the corporation the equal protection of the laws. It is hard to see how that conclusion can be reconciled, in principle, with the present decision. See also *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415; *Bethlehem Motors Co.* v. *Flynt,* 256 U. S. 421; *Kansas City So. Ry.* v. *Road Imp. Dist. No. 6,* 256 U. S. 658; *Air-Way Corp.* v. *Day,* 266 U. S. 71, 83, 85; *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 37. A long list of illustrative cases which tend to support the view that the act in question is violative of the equal protection clause of the Fourteenth Amendment readily could be added; but nothing would be gained by doing so.

A large number of decisions are cited in support of the act. They, as well as those cited above, demonstrate the impossibility of stating precisely or categorically the distinction between such statutes as fall within, and such as fall without, the ban of the Constitution. The decisions have depended not only upon the varying facts which constituted the background for the particular legislation under consideration, but also, to some extent, upon the point of view of the courts or judges who have been called upon to deal with the question. Some of the cases press

to the limit fixed by the Constitution; and that fact, while affording no ground for objection to the cases themselves, admonishes us to use caution in applying them to other sets of substantially dissimilar circumstances, lest, by doing so, we pass into the forbidden territory which lies wholly beyond the verge. I am unable to discover in any of the prior decisions of this Court, including those cited, anything, which in the light of the facts and circumstances herein set forth, lends support to the claim of validity for the classification here under consideration. To attempt an extended review of the cases thought to do so is not necessary. It will be enough to refer to those which seem to be regarded as most strongly in point.

*American Sugar Rfg. Co.* v. *Louisiana,* 179 U. S. 89, involved the validity of a license tax upon those carrying on the business of refining sugar and molasses, but exempted planters and farmers grinding and refining their own sugar and molasses. The classification was upheld upon the ground that the steps taken by planters and farmers to perfect their product for the market were an incident to the original growth of the cane; and that this distinction saved the classification from being purely arbitrary, oppressive or capricious. It was, as this Court pointed out in *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540, 561, a tax upon the *business* of refining sugar and molasses, exempting therefrom those who refined only their own sugar and molasses.

In *Cargill Co.* v. *Minnesota,* 180 U. S. 452, the statute required that the owner of an elevator or warehouse situated on the right of way of a railroad, etc., should procure a license therefor at a nominal fee. The act was assailed because it did not apply to elevators and warehouses not so situated. The Court sustained the classification because the railroad was a public highway, the use of which could be so regulated as to promote the ends for which the corporation was created and thus subserve the interests

of the general public. Moreover, it was neither alleged nor proved in that case that there were in the state any elevators or warehouses not situated upon a railroad right of way.

In *Quong Wing* v. *Kirkendall*, 223 U. S. 59, the statute involved imposed a license fee on hand laundries, but not upon steam laundries, and exempted from its operation laundries not employing more than two women. The -classification was sustained, principally upon the authority of the two cases referred to immediately above.

In *Metropolis Theatre Co.* v. *Chicago*, 228 U. S. 61, a classification of theatres for license fees graded according to the prices of admission was held not to be arbitrary or unreasonable, because, although there might be exceptional cases, there was a natural relation between the price of admission and revenue.

While opinions might differ in respect of the wisdom or fairness of some of the statutes involved, as, for example, the laundry tax statute which taxed the small hand laundry and exempted the large steam laundry, the differences were germane to the object and sufficiently substantial to save the classification in each case from being condemned as purely arbitrary or capricious.

It may be that here the maximum tax of $25 for each store, while relatively high, is not, if considered by itself, excessive; but to sustain it will open the door of opportunity to the state to increase the amount to an oppressive extent. This Court frequently has said, and it can not be too often repeated in cases of this character, that the power to tax is the power to destroy; and this constitutes a reason why that power, however moderately exercised in given instances, should be jealously confined to the limits set by the Constitution. Compare *Knowlton* v. *Moore*, 178 U. S. 41, 60. In *Veazie Bank* v. *Fenno*, 8 Wall. 533, a tax of ten per cent. imposed on the notes of state banks was upheld, although it " drove out of existence every state

bank of circulation within a year or two after its passage," *Loan Association* v. *Topeka*, 20 Wall. 655, 663–664. In the face of this decision, and others which might be cited, there does not seem to be any sure comfort in the suggestion, sometimes made, that this Court may be expected to intervene whenever the tax reaches the point of destruction.

For the foregoing reasons, the judgment below should be affirmed.

MR. JUSTICE VAN DEVANTER, MR. JUSTICE McREYNOLDS, and MR. JUSTICE BUTLER concur in this opinion.